J-A18034-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTHER HENDRICKS, AS ADMINISTRATRIX OF THE ESTATE OF ESTHER BROWN, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MANOR CARE OF WEST READING PA, LLC, MANOR CARE HEALTH SERVICES, INC., MANOR CARE, INC., HCR MANORCARE, INC., HCR HEALTHCARE, LLC D/B/A MANORCARE HEALTH SERVICES-WEST READING NORTH, HCR II HEALTHCARE, LLC, HCR III HEALTHCARE, LLC, HCR IV HEALTHCARE, LLC, | |
| Appellants | No. 1375 MDA 2014 |

Appeal from the Order entered July 25, 2014
In the Court of Common Pleas of Berks County
Civil Division at No: 13-2028

BEFORE: FORD ELLIOTT, P.J.E., STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                **FILED SEPTEMBER 24, 2015**

Esther Hendricks, as guardian of the person and of estate of her mother, Esther Brown (Decedent), filed suit against Appellants (collectively, ManorCare), bringing claims based on abuse and neglect that occurred during Decedent's stay at ManorCare's West Reading North, Berks County, facility. ManorCare appeals from an order overruling its preliminary objections to compel arbitration of Hendricks' claims under an Arbitration Agreement she signed for Decedent. We hold that the trial court did not

abuse its discretion in overruling ManorCare's preliminary objections, because ManorCare failed to prove that Hendricks had authority to sign the Arbitration Agreement on Decedent's behalf.

On February 3, 2011, Decedent was admitted to ManorCare West Reading North. Decedent had been referred to there by the Berks County Office on Aging. She had previously lived with Hendricks and attended an adult daycare. Hendricks' complaint alleges that Decedent suffered from a variety of medical ailments at the time of her admission to ManorCare West Reading North. On the day of her admission, Decedent met with Beverly Henry, an admission coordinator. Henry testified at deposition that she went over the admission paperwork with Decedent, and Decedent signed a four-page admission agreement. However, according to Henry, Decedent was not very focused, so Henry asked whether Decedent would allow her daughter, Hendricks, to finish signing the other admission paperwork. Decedent apparently approved. The Office on Aging informed Henry that Hendricks was Decedent's emergency contact.

Henry knew that that Hendricks did not have power of attorney for Decedent, because a staffer at the Office on Aging told her. The next day, February 4, 2011, Henry had Hendricks sign more admission paperwork on Decedent's behalf. Henry also presented Hendricks with an Arbitration Agreement, which she signed.

The Arbitration Agreement was four pages. Henry explained that she always reviews the material provisions of the Arbitration Agreement with patients or their families, and that she did so with Hendricks:

Q. What is that you do on this overview of the program?

A. Well, I explain to the patient that it is a voluntary—or to the family that it is a voluntary agreement, that the company asks, you know, me to speak with them about that, in the event, there would be a legal dispute that arises that, instead of going through the traditional court system, the case would be settled through arbitration.

And I tell them how it works is that there would be a panel of three arbitrators that are either retired judges or lawyers that have extensive experience that would hear the case, make a decision; and that it is binding; and that, with it being binding, we're agreeing to abide by their decision, that there is [sic] no appeals.

Q. Anything else?

A. And then I ask them that—if they would be, you know, agreeable to settling any future disputes this way.

Q. Now, this is what you generally do. Can you say for a fact that you did so on February the 4th[, 2011]?

A. I'm sure I did.

Plaintiff's Supp. Memo. of Law in Support of Plaintiff's Opp. to Defendants' Preliminary Objs. Regarding the Arbitration Agreement and Certificate of Service, Exhibit E, Beverly Henry Dep., 9/23/13, at 81-83.

Hendricks testified that she did not remember reading or signing the Arbitration Agreement, but she must have signed it, because she identified her signature:

Q. Even as we look at the [A]rbitration [A]greement, nothing is coming back to you?  You don't have any recollection of signing that document?

A. No.  That (sic) been since 2011.

Q. You have no—you have no recollection of signing pretty much any of the documents that are dated February 4th, 2011, the same day that the [A]rbitration [A]greement was signed?

A. No, I don't.  But it has my signature, so that means I signed them [sic].

Q. The fact that you signed the [A]rbitration [A]greement and it has your signature on it and it is dated February 4th, 2011, does that mean that you read and understood the arbitration agreement?

[COUNSEL FOR HENDRICKS]: Object to form.

[THE WITNESS]: Yes.

Plaintiff's Supp. Memo. of Law in Support of Plaintiff's Opp. to Defendants' Preliminary Objs. Regarding the Arbitration Agreement and Certificate of Service, Exhibit D, Esther Hendricks Dep., 9/23/13, at 92-93.

The Arbitration Agreement was voluntary, *i.e.*, Decedent did not need to sign it to be admitted to ManorCare West Reading North.  Other provisions included mandatory arbitration before a panel of three arbitrators, and administration by the National Arbitration Forum (NAF), and use of the NAF's procedure.  Because of the manner in which we resolve this appeal, we need not engage in a detailed analysis of the Arbitration Agreement's terms.

On January 5, 2013, Decedent was hospitalized with a head wound, which Hendricks alleges occurred when a ManorCare nurse assaulted

Decedent.[1]  Hendricks alleges other neglect while Decedent was a resident, causing her physical and mental health to deteriorate.

Decedent filed suit on February 12, 2013, by writ of summons. Subsequently, the orphans' court appointed Hendricks as guardian of the person and estate of Decedent.  Acting in her capacity as guardian, Hendricks filed a complaint bringing claims for negligence, negligence *per se*, and battery against ManorCare.[2]  ManorCare responded to the complaint by preliminary objections. ManorCare, citing the Arbitration Agreement, sought to compel arbitration.  Thereafter, the parties engaged in discovery limited to the enforceability of the Arbitration Agreement. On July 23, 2014, the trial court entered an order sustaining in part and overruling in part ManorCare's preliminary objections.  Relevant to this appeal, the trial court refused to enforce the Arbitration Agreement.

ManorCare appealed, and filed a concise statement as ordered, in which it raised eleven issues.  The trial court filed a responsive opinion, in which it concluded that (1) Hendricks had no authority to sign the Arbitration Agreement for Decedent; (2) Hendricks' waiver of the right to trial by jury

_____

[1] Despite Hendricks' statements in her brief, **see** Appellee's Brief at 5-6, the nurse was cited only for harassment, and was not charged with, or found guilty of, assault.  In other words, Hendricks' allegations of battery remain unproven allegations.

[2] In August 2013, Decedent passed away, and Hendricks was substituted as administratrix of her estate.

was unknowing and involuntary because she neither read nor understood the Arbitration Agreement; (3) the Arbitration Agreement was unenforceable because it was unconscionable; and (4) arbitration is generally inappropriate for non-commercial disputes.

Though the order appealed from is interlocutory, it is immediately appealable as of right under the Uniform Arbitration Act. **See** 42 Pa.C.S.A. § 7320; **see also** Pa.R.A.P. 311(a)(8) ("An [interlocutory] appeal may be taken as of right . . . from . . . [a]n order which is made appealable by statute or general rule.").

ManorCare raises seven questions for review.

1. Whether the [t]rial [c]ourt, in refusing to enforce the Arbitration Agreement, violated the provisions of the Federal Arbitration Act ("FAA"),[3] and U.S. Supreme Court's precedent interpreting the FAA, which strongly favors the arbitration of disputes?

2. Whether Esther R. Hendricks was authorized to sign the Arbitration Agreement by virtue of several theories of agency, including direct, implied or apparent authority, and/or agency by estoppel?

3. Whether the [trial c]ourt erred in finding that the Arbitration Agreement was procedurally and substantively unconscionable?

4. Whether the [trial c]ourt erred in finding that Esther R. Hendricks, as the authorized agent for [Decedent], did not knowingly and voluntarily waive the right to trial by jury by signing the Arbitration Agreement?

---

[3] 9 U.S.C. §§ 1-16.

5. Whether the [trial c]ourt erred in finding that the unavailability of the National Arbitration Forum ("NAF") to administer any arbitration proceedings rendered the Arbitration Agreement unenforceable, even though the Agreement provided for alternatives?

6. Whether the [t]rial [c]ourt erred in finding that the Arbitration Agreement was unenforceable because it bound multiple parties?

7. Whether the trial [court] erred in finding that the Arbitration Agreement was unenforceable because it did not provide for a termination date or a terminating event?

Appellant's Brief at 5-6 (answers omitted).

On appeal from an order refusing to compel arbitration, our standard

of review is as follows:

> Our review of a claim that the trial court improperly denied the appellant's preliminary objections in the nature of a petition to compel arbitration is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition.

> **Walton v. Johnson**, 66 A.3d 782, 787 (Pa. Super. 2013) (quoting **Gaffer** [**Ins. Co., Ltd. v. Discover Reins. Co.**], 936 A.2d [1109,] 1112 [(Pa. Super. 2007)]). "In doing so, we employ a two-part test to determine whether the trial court should have compelled arbitration." **Elwyn**[ **v. Deluca**], 48 A.3d [457,] 461 [(Pa. Super. 2012)] (quoting **Smay v. E.R. Stuebner, Inc.**, 864 A.2d 1266, 1270 (Pa. Super. 2004)). First, we examine whether a valid agreement to arbitrate exists. Second, we must determine whether the dispute is within the scope of the agreement.

**Pisano v. Extendicare Homes, Inc.**, 77 A.3d 651, 654-55 (Pa. Super. 2013). Our scope of review is plenary. **McNulty v. H&R Block, Inc.**, 843 A.2d 1267, 1269 (Pa. Super. 2004), *abrogated on other grounds by*, **AT&T Mobility, LLC v. Concepcion**, 131 S. Ct. 1740 (2011).

ManorCare asserts the Arbitration Agreement is valid and binding, and that the trial court erred in concluding otherwise. The Arbitration Agreement's scope is broad. It applies to:

> [a]ny and all claims or controversies arising out of or *in any way* relating to this Agreement, the Admission Agreement[,] or any of the Patient's stays at this Center, or any Center operated by any subsidiary of HCR-Manor Care, Inc., whether or not related to medical malpractice, including but not limited to disputes regarding the making, execution, validity, enforceability, voidabilty, unconscionability, severability, scope, interpretation, preemption, waiver, or any other defense to enforceability of this Agreement or the Admission Agreement, whether arising out of State or Federal law, whether existing now or arising in the future, whether for statutory compensatory[,] or punitive damages and whether sounding in breach of contract, tort[,] or breach of statutory duties (including, without limitation except as indicated, any claim based on Patient's Rights or a claim for unpaid Center charges) regardless of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to binding arbitration.

Arbitration Agreement ¶ B (emphasis in original). Hendricks contends that, if the Arbitration Agreement is valid, her claims are outside of its scope because she alleges Decedent was subject to criminal abuse while a resident of ManorCare's facility. We begin by addressing the validity of the Arbitration Agreement. In doing so, we consider ManorCare's second argument, which we find dispositive.

Pennsylvania law and the FAA treat agreements to arbitrate the same as other contracts. *See* 42 Pa.C.S.A. § 7303; 9 U.S.C. § 2. "[A] party 'can be compelled to arbitrate under an agreement, even if he or she did not sign that agreement, if common-law principles of agency and contract support

such an obligation on his or her part.'" **Array Healthcare Facilities Solutions, Inc. v. Pesce**, 2 Pa. D. & C.5th 547, 566 (C.P. Phila. 2006) (quoting **Bouriez v. Carnegie Mellon Univ.**, 359 F.3d 292, 294 (3d Cir. 2004)), *aff'd*, 931 A.2d 60 (Pa. Super. 2007) (unpublished memorandum). Therefore, we will apply general principals of agency law to determine whether Hendricks had actual or apparent authority to sign the Arbitration Agreement on behalf of Decedent.

Agency is a relationship whereby the principal manifests assent that another person (the agent) will act on the principal's behalf subject to the principal's control, and the agent agrees to do so. **See Basile v. H&R Block, Inc.**, 761 A.2d 1115, 1120 (Pa. 2000). "An agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel." **Walton**, 66 A.3d at 786. Agency cannot be inferred from mere relationships or family ties, and we do not assume agency merely because one person acts on behalf of another. **Id.** at 787 (quoting **Sidle v. Kaufman**, 29 A.2d 77, 81 (Pa. 1942)). Rather, we look to facts to determine whether the principal expressly or impliedly intended to create an agency relationship. **Id.** "The creation of an agency relationship requires no special formalities." **Id.** (quotation omitted). Finally, the party asserting the agency relationship bears the burden of proving it by a preponderance of the evidence. **Id.**

ManorCare contends that Hendricks was her mother's agent under the first three of the four above theories, though it combines discussion of all in a single paragraph of its brief. We will address the theories *ad seriatim*.

ManorCare argues Hendricks had authority to sign the Arbitration Agreement on her mother's behalf through an express grant of permission. "Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters." ***Walton***, 66 A.3d at 786 (citing ***Bolus v. United Penn Bank***, 525 A.2d 1215 (Pa. Super. 1987)). "Express authority is to be strictly construed." ***Jones v. Van Norman***, 522 A.2d 503, 511 (Pa. 1987). An agent with express authority also acquires implied authority, which "exists in situations where the agent's actions are 'proper, usual and necessary' to carry out express agency." ***Walton***, 66 A.3d at 786 (quoting ***Passarelli v. Shields***, 156 A.2d 343, 347 (Pa. Super. 1959)).

From ManorCare's brief, it is difficult to discern the evidence supporting express authority. Perhaps this is so because there is scant evidence to support such a finding. As noted above, Beverly Henry, ManorCare West Reading North, testified at deposition that the referral source, a staffer at the Berks County Office on Aging, told Henry that Hendricks could sign the admission paperwork if Decedent was unable. Henry testified that Decedent said Hendricks could finish the admission process for her, which is the only possible evidence of an express grant. ManorCare presented no evidence that Henry or another employee asked

Decedent about agreeing to arbitrate any disputes. It also presented no evidence that Decedent said that Hendricks could sign an arbitration agreement on her behalf. Of course, Hendricks testified that she thought she was responsible for her mother, she was authorized under state law to sign the paperwork, and she had the legal ability to do so. The evidence here falls far short of showing that Hendricks had express authority to consent to arbitration on Decedent's behalf.

Moreover, because Hendricks had no express authority, she had no implied authority, either. *See **Walton***, 66 A.3d at 787 ("An agent cannot simply by his own words, invest himself with apparent authority. Such authority emanates from the action of the principal and not the agent.") (quotation omitted). In sum, Hendricks lacked express or implied authority to sign the Arbitration Agreement.

ManorCare further argues that Hendricks had apparent authority to sign the Arbitration Agreement for her mother. "Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act." ***Walton***, 66 A.3d at 786 (citing ***Turner Hydraulics v. Susquehanna Constr. Co.***, 606 A.2d 532 (Pa. Super. 1992)).

ManorCare fails to convince us that Hendricks possessed apparent authority to sign the Arbitration Agreement. Apparent authority is created by the acts of the **principal**, *i.e.*, Decedent. ManorCare errs by focusing entirely on the acts of the purported **agent**, *i.e.*, Hendricks. Hendricks'

actions are legally irrelevant to whether Decedent's actions caused ManorCare's officers or employees to believe that Hendricks could sign the Arbitration Agreement. Additionally, Hendricks' signing of a retainer agreement on Decedent's behalf in 2013—two years after she signed the Arbitration Agreement—are arguably irrelevant, too.

To the extent ManorCare argues in favor of authority by estoppel, we find its argument unavailing. "Authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of [his or her belief] that the purported agent was authorized to act on behalf of the principal." *Walton*, 66 A.3d at 786 (citing *Turnway Corp. v. Soffer*, 336 A.2d 871 (Pa. 1975)). ManorCare has pointed to no actions by **Decedent** leading it to believe she granted Hendricks authority to consent to arbitration, and it fails to cite what reasonable steps Decedent failed to take to disavow the creation of agency.

ManorCare also argues Hendricks should be barred from denying her authority as Decedent's agent by equitable estoppel.

> Equitable estoppel is a doctrine whereby a party will be bound by [its] representations if they are justifiably relied upon by another party. Equitable estoppel arises when a party by acts or representation intentionally or through culpable negligence, induces another to believe that certain facts exist and the other justifiably relies and acts upon such belief, so that the latter will be prejudiced if the former is permitted to deny the existence of such facts.

*Guerra v. Redev. Author. of City of Phila.*, 27 A.3d 1284, 1290 (Pa. Super. 2011) (internal quotations omitted). The party asserting estoppel

bears the burden of proof by clear and convincing evidence. ***Prime Medica Assocs. v. Valley Forge Ins. Co.***, 970 A.2d 1149, 1157 (Pa. Super. 2009).

ManorCare's equitable estoppel argument is meritless. ManorCare argues, in conclusory fashion, that Hendricks' purported ability to file suit on Decedent's behalf means that she also had the ability to consent to arbitration for her. ManorCare fails to state how Hendricks' actions in **2013** induced it to believe that Hendricks was Decedent's agent in **2011**. The argument is a *non sequitur*. It is entirely possible that Decedent was more lucid in 2011 than she was in 2013, or that she gave Hendricks authority to file suit, but not to consent to arbitration. ManorCare also fails to show which actions of Hendricks or Decedent it justifiably relied upon to trigger equitable estoppel. Finally, it points to no facts showing that it attempted to confirm any grant of agency to Hendricks.

In sum, the trial court did not abuse its discretion in ruling that ManorCare failed to show Hendricks was validly acting as Decedent's agent when she signed the Arbitration Agreement. Thus, the trial court did not err in concluding that ManorCare failed to meet its burden of proving that Hendricks was Decedent's agent. The Arbitration Agreement is therefore unenforceable.

Because the Arbitration Agreement is unenforceable under principles of law that apply equally to all contracts, we need not address ManorCare's first argument that the trial court ignored or violated the FAA's policy in favor of arbitration. Under both the FAA and the Uniform Arbitration Act, a court

may refuse to enforce an arbitration agreement "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; 42 Pa.C.S.A. § 7303. In other words, the FAA places arbitration agreements on the same footing as other contracts. *Gaffer Ins.*, 936 A.2d at 1113 (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293-94 (2002)). Here, the Arbitration Agreement is invalid under principles of law applicable to all contracts. *See, e.g., Reutzel v. Douglas*, 870 A.2d 787, 793 (Pa. 2005) (holding void a settlement agreement entered into by an attorney without his clients' consent).

We do not need to address ManorCare's remaining arguments, or Hendricks' arguments in favor of affirming on alternative grounds, including its contention that Hendricks' claims are not within the Arbitration Agreement's scope.

The Arbitration Agreement in this case is unenforceable because Hendricks lacked authority to sign it on behalf of her now-deceased mother. Therefore, the trial court did not abuse its discretion in overruling, in relevant part, ManorCare's preliminary objections to compel arbitration.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/24/2015

- 14 -